**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**WESLACO HOLDING COMPANY, L.L.C.,**

       **Plaintiff,**

**v.**                                                                      **CIVIL ACTION NO. 2:06cv598**

**HILTON C. PITTMAN, et al.,**

       **Defendants.**

*MEMORANDUM OPINION AND ORDER*

The Court held a bench trial in the above-captioned matter on July 11, 2007. Having conducted a trial and thoroughly reviewed the evidence, arguments, and records in this case, the Court finds that this case is ripe for decision. For the reasons stated below, the Court awards judgment for Defendants Hilton C. Pittman ("Pittman") and Vincent I. Rasmussen ("Rasmussen").

**I. PROCEDURAL HISTORY AND FACTUAL FINDINGS**

**A. Procedural History**

On September 29, 2006, the Plaintiff, Weslaco Holding Company, L.L.C. ("Weslaco"), filed suit against Pittman, Rasmussen, and James C. Lingenfelter ("Lingenfelter") (collectively "Defendants") in the Circuit Court for the City of Norfolk, Virginia. The complaint alleged that Defendants owed a debt to Weslaco resulting from a certain provision in an Investment Agreement between Weslaco's predecessor company, Caldwell/VSR, Inc. ("Caldwell/VSR"), CaptialSouth Partners Fund I Limited Partnership ("CapitalSouth"), and Waterside Capital

Corporation ("Waterside"). Pittman filed an answer on October 23, 2006. On October 26, 2006, Pittman removed this case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

On December 15, 2006, the clerk entered default against Rasmussen and Lingenfelter. On May 24, 2007, Rasmussen filed a motion to set aside entry of default. On May 29, 2007, Rasmussen filed an answer to the complaint, subject to leave of the Court. On July 11, 2007, the Court granted Rasmussen's motion to set aside entry of default and granted Rasmussen leave to filed the answer. The Court held a bench trial on July 11, 2007.

## B. Factual Findings

### 1. Stipulated Facts

Weslaco is a limited liability corporation organized under Virginia law with its principal place of business in Norfolk, Virginia. (Final Pre-Trial Order at ¶ 1(a).) Pittman is a citizen and resident of North Carolina; Lingenfelter is a citizen and resident of California; and Rasmussen is a citizen and resident of Montana. (*Id.* at ¶ 1(b), (c), (d).) Weslaco purchased certain assets formerly held by Caldwell/VSR pursuant to a bankruptcy court order. (*Id.* at ¶ 1(a).) Caldwell/VSR, Pittman, Lingenfelter, Rasmussen, CapitalSouth, and Waterside entered into an Investment Agreement as of December 7, 2001. (*Id.* at ¶ 1(f).) The parties entered into a First Amendment to the Investment Agreement dated October 31, 2003. (*Id.* at ¶ 1(g).)

### 2. Additional Trial Factual Findings

Caldwell/VSR manufactured wood blinds and shutters. (Hilton C. Pittman's and Vincent I. Rasmussen's Br. in Supp. of Mot. for Summ. J. at 1.) Pittman, Lingenfelter, and Rasmussen were controlling shareholders of Caldwell/VSR. (Weslaco's Summ. J. Brief at 2.) Caldwell/VSR, Defendants, and Waterside entered into the December 7, 2001 Investment

Agreement in order for CapitalSouth and Waterside to provide working capital for Caldwell/VSR. (Hilton C. Pittman's and Vincent I. Rasmussen's Br. in Supp. of Mot. for Summ. J. at 2.) During negotiations over the Investment Agreement, CapitalSouth and Waterside were concerned about the possible impact of certain pending environmental litigation in Texas in which Caldwell/VSR was a party. (Tr. at 67-68, 83.) Specifically, CapitalSouth and Waterside were concerned about the potential of this litigation to impact Caldwell/VSR's ability to comply with any loan terms. (*Id.*) The eventual solution to this concern was the inclusion of a paragraph in the Investment Agreement where Defendants agreed to reimburse Caldwell/VSR. (*Id.* at 87.) The paragraph at issue, 7(r), states in its entirety:

> Reimbursement of Environmental Litigation Costs. In the event that the Company breaches Sections 7(d), 8(y) or 8(z) of this Agreement or Sections 5.11, 5.12 or 5.13 of the Senior Credit Agreement, then the Management Shareholders shall, jointly and severally, promptly pay to the Company an amount of cash sufficient to cure such breach; provided, however, the maximum amount that the Management Shareholders shall be liable for pursuant to this section 7(r) shall not exceed the total amount of costs and expenses (including, without limitation, attorneys' fees and expenses, litigation costs and expenses, and settlement costs and expenses) incurred by the Company in connection with the "Texas Environmental Matter." For purposes of this Section 7(r), "Texas Environmental Matter" means the lawsuit filed by Juan Raul Cantu, et. al. against Caldwell/VSR, Inc. et. al. in the District Court of Hidalgo County, Texas and any other action, proceeding or litigation arising from or related to such lawsuit.

(Pl.'s Ex. A at 19.) The interpretation of the above paragraph is the issue currently in dispute.

In 2003, CapitalSouth and Waterside loaned additional money to Caldwell/VSR. (Tr. at 13-14.) An amendment was added to the Investment Agreement. (Pl.'s Ex. D.) The reimbursement provision set forth above was not modified.

Caldwell/VSR defaulted on its obligations to CapitalSouth and Waterside in July 2004.

(Hilton C. Pittman's and Vincent I. Rasmussen's Br. in Supp. of Mot. for Summ. J. at 2-3; Tr. at 102.) Caldwell/VSR filed a bankrupctcy petition in December 2004. (Tr. at 61.) CapitalSouth and Waterside created Weslaco in order to bid on Caldwell/VSR's assets in bankruptcy. (*Id.* at 23.) Weslaco was the sole bidder on the assets in bankruptcy, and did in fact acquire those assets. (Tr. at 24; Pl.'s Ex. H.)

## II. CONCLUSIONS OF LAW

### A. Choice of Law

The Court must first determine which state's law applies to the Investment Agreement. In a diversity case, "federal courts are to apply the substantive law the State in which they are sitting would apply if the case had originated in a State court." *Stonehocker v. Gen. Motors Corp.*, 587 F.2d 151, 154 (4th Cir. 1978). However, the Agreement states specifically that, "Governing Law. This Agreement shall be governed in all respects by the laws of the State of North Carolina, without regard to its conflict of laws provisions." (Pl.'s Ex. A, at 30.) Under Virginia law, "where parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990). Therefore, North Carolina law applies to the Investment Agreement.

### B. Parol Evidence

Normally, the construction of a contract is a question of law. *Cole v. Indus. Fibre Co.*, 200 N.C. 484, 487, 157 S.E. 857, 858 (1931). "If the plain language of a contract is clear, the

intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). However, if a contract is ambiguous, interpretation of the contract is a question of fact and extrinsic evidence may be considered. *Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 266-67, 554 S.E.2d 863, 866 (2001). "An ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Glover v. First Union Nat'l Bank of North Carolina*, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). "[I]f there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Crider*, 147 N.C. App. at 267, 554 S.E.2d at 867. Finally, "[W]here . . . a question of doubtful meaning arises, and it appears that the parties themselves have interpreted their contract, practically or otherwise, the courts will ordinarily follow such interpretation . . . ." *Cole*, 200 N.C. at 487, 157 S.E. at 858.

### III. ANALYSIS

Weslaco's chief argument is that the language of paragraph 7(r) of the Investment Agreement is unambiguous. Weslaco argues that because it is undisputed that Caldwell/VSR defaulted on its obligations to CapitalSouth and Waterside, Defendants owe Weslaco an amount capped by the costs of the Texas environmental litigation referenced in paragraph 7(r). Pittman and Rasmussen, however, maintain that such an interpretation is inconsistent with paragraph 7(r). They seek to show by parol evidence that the true intent of the parties was that Defendants would reimburse Caldwell/VSR for any default *caused by* the Texas environmental litigation, and that Caldwell/VSR's eventual default had nothing to do with that litigation.

The Court finds that the language in paragraph 7(r) of the Investment Agreement is

ambiguous. The paragraph first discusses default by Caldwell/VSR, then states that in the event of such a default "the Management Shareholders shall, jointly and severally, promptly pay to the Company an amount of cash sufficient to cure such breach; <u>provided</u>, <u>however</u>, the maximum amount" of the payments is capped by the costs incurred in the Texas environmental litigation. (Pl.'s Ex. A at 19.) The parties did not choose some negotiated flat amount for a cap, but rather tied the amount owed specifically to certain described litigation. Furthermore, the paragraph does not define Defendants' obligations in one sentence and then define the cap in a separate sentence. Rather, the sentence creating Defendants' obligations goes on to limit the potential liability by stating "<u>provided</u>, <u>however</u>" the maximum amount owed cannot exceed the Texas environmental litigation costs. Tying the cap to such a specific, detailed matter as well as the structure of the paragraph creates ambiguity as to the parties' intent.

In *Whitten v. Bob King's AMC/Jeep, Inc.*, 292 N.C. 84, 86, 231 S.E.2d 891, 892 (1977), the Supreme Court of North Carolina considered whether a written memorandum of agreement between an investor plaintiff and the defendant was ambiguous. The defendant claimed that the agreement provided for a simple loan from the plaintiff, while the plaintiff investor claimed that the agreement obligated the defendant to eventually convey stock to the plaintiff. *Id.* at 92, 231 S.E.2d at 895. The operative language of the agreement stated, "This is to verify that [plaintiff] did invest five thousand dollars in Triangle Motor Sales Inc. This money was loaned to [defendant] until such time as stock could be issued in the company which will be after American Motor Sales Corp. has been bought out." *Id.* at 86, 231 S.E.2d at 892. The language spoke specifically of a loan from the plaintiff, but also mentioned the issuance of stock. The language did not specifically state that the stock would be issued to the plaintiff. The Supreme Court of

6

North Carolina stated that this language was ambiguous, and held that summary judgment was not appropriate because both parties had presented factual evidence tending to support different interpretations.  *Id.* at 92, 231 S.E.2d at 895-96.

The instant case is similar to *Whitten*.  Here, the language of paragraph 7(r) speaks specifically of Defendants' obligations when Caldwell/VSR defaults, but mentions these obligations in the context of the specific potential liability of Caldwell/VSR resulting from environmental litigation in Texas.  The intent of the parties is not clear.  *See Pike*, 274 N.C. at 11, 161 S.E.2d at 462 ("The heart of a contract is the intention of the parties . . . .").  Therefore, parol evidence will be considered to determine the intent behind paragraph 7(r).  *See Parker Marking Sys., Inc. v. Diagraph-Bradley Indus., Inc.*, 80 N.C. App. 177, 181, 341 S.E.2d 92, 95 (1986) (stating that when "the language used by the parties is ambiguous and their intention unclear . . . . Extrinsic evidence relating to the agreement is competent to show the intentions of the parties and to clarify the terms of the contract. "  (citation omitted)).

The extrinsic evidence in this case points strongly toward the interpretation that paragraph 7(r) was meant to apply only if Caldwell/VSR defaulted *because of* the described Texas environmental litigation.  Pittman and Rasmussen testified at trial that they only agreed to reimburse Caldwell/VSR if the company lost the Texas environmental litigation.  (Tr. at 94, 106-07.)  Pittman testified that during the Investment Agreement negotiations, Defendants were asked to personally guarantee the proposed loan because of uncertainty surrounding the Texas litigation.  (*Id.* at 98.)  Defendants refused to give the personal guarantee.  (*Id.*)  Pittman stated that Defendants did agree to insulate CapitalSouth and Waterside from losses relating to the Texas litigation, because Defendants were very confident about their chances in the lawsuit.  (*Id.*

7

at 98-99.) In addition, the letter of proposal from CapitalSouth and Waterside to Pittman discussing the deal embodied in the Investment Agreement includes the following proposed term, "Limited personal guarantee of Management Shareholders to indemnify Lenders for any loss relating to the pending lawsuit." (Defs.' Ex. 6. at 2.) Finally, Martin N. Speroni ("Speroni"), the president of Waterside and the primary person at Waterside dealing with Caldwell/VSR and Weslaco, testified that, "The business discussion that I remember [regarding paragraph 7(r)] is that we did not want to buy into a lawsuit. We were very hesitant, and we wanted to be insulated from that exposure. So we needed something to keep us harmless from that, and under those conditions, we would make the investment." (Tr. at 8, 67-68.) Defendants were not interested in any blanket personal guarantee of Caldwell/VSR's debts, but instead were willing to alleviate any concern over potential liability resulting specifically from the Texas litigation.

Pittman's and Rasmussen's testimony about the nature of the Investment Agreement negotiations was supported by the testimony of Grant S. Grayson ("Grayson"). Grayson represented Caldwell/VSR during the Investment Agreement negotiations. (*Id.* at 81-82.) Grayson testified that paragraph 7(r) was meant to apply to a default that was caused by the environmental litigation because of CapitalSouth's and Waterside's concerns regarding the possible liability stemming from that litigation. (*Id.* at 83, 87.) A memo that Grayson sent during the negotiations states that CapitalSouth's and Waterside's recourse was to be limited to their pledged stock, but that Defendants would agree to cure any default caused by the Texas litigation. (Defs.' Ex. 4 at 1-2.)

In addition to the above evidence, the parties' conduct also casts light on the intent behind paragraph 7(r). *See Cordaro v. Singleton*, 31 N.C. App. 476, 479, 229 S.E.2d 707, 710 (1976)

8

("Evidence of conduct by the parties after executing the contract is not subject to the parol evidence rule, and is admissible to show intent and meaning."). As noted above, Caldwell/VSR defaulted in July 2004 and filed a bankruptcy petition in December 2004. (Hilton C. Pittman's and Vincent I. Rasmussen's Br. in Supp. of Mot. for Summ. J. at 2-3.) Speroni testified that no notice of default was sent after Caldwell/VSR defaulted. (Tr. at 64.) Pittman and Rasmussen both testified that they never received a notice of default relating to paragraph 7(r). (*Id.* at 103, 109.) Furthermore, Speroni testified that he does not recall seeing the instant claim against Defendants on the bankruptcy schedules filed by Caldwell/VSR, at least in the amount currently demanded. (*Id.* at 61-62.) Official Bankruptcy Form 6, Schedule B, signed under penalty of perjury, requires a listing of "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," with a requirement for listing the estimated value of each. The catch-all provision of Schedule B requires listing "[o]ther personal property of any kind not already listed. Itemize." CapitalSouth, Waterside, and Weslaco did not conduct themselves as if they believed they had a claim against Defendants when Caldwell/VSR eventually did default and declare bankruptcy.

In summary, the Court finds that the language of paragraph 7(r) of the Investment Agreement is ambiguous such that parol evidence is appropriate to determine the parties' intent. The parol evidence points strongly toward the conclusion that the parties intended that Defendants only be liable in the event Caldwell/VSR defaulted because of the referenced Texas environmental litigation. Uncontroverted testimony from Pittman and Rasmussen established that Caldwell/VSR won the Texas litigation. (Tr. at 100-01, 109.) Caldwell/VSR defaulted approximately two years after the Texas litigation was successfully completed. (*Id.* at 101-03.)

The default was caused primarily by the loss of two of Caldwell/VSR's largest customers to overseas competition, and had nothing to do with the Texas litigation. (*Id.* at 102-03, 109.) Therefore, Pittman's and Rasmussen's obligation under paragraph 7(r) was never triggered, and they now owe Weslaco nothing.

### IV. CONCLUSION

The Court finds that the contract at issue is ambiguous, and that the extrinsic evidence and the conduct of the parties shows that Defendants were to owe an obligation to Caldwell/VSR only if the company defaulted because of the Texas environmental litigation. Caldwell/VSR did not default because of that litigation. Therefore, the Court awards judgment to Defendants Pittman and Rasmussen.

The clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to the parties.

**IT IS SO ORDERED**.

_____/s/_____
Raymond A. Jackson
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 2, 2007